UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

UNITED STATES OF AMERICA        :
                             :

          - v. -               :     S2 12 Cr. 489 (RA)
                             :     14 Cr. 75 (RA)

PAUL CALDER LEROUX,         :
  a/k/a "Bernard John Bowlins,"   :
  a/k/a "John Smith,"          :
  a/k/a "Johan Smit,"           :
                             :
                   Defendant.    :
                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM
## AND MOTION PURSUANT TO U.S.S.G. § 5K1.1

<br>

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

Emil J. Bove, III
Rebekah Donaleski
Michael D. Lockard
Assistant United States Attorney
    *- Of Counsel -*

The Government respectfully submits the following to advise the Court of the pertinent facts concerning the assistance that the defendant Paul Calder Leroux (the "defendant" or "Leroux") has rendered to the Government. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## I.    The Defendant's Background

Leroux was born on December 24, 1972, in Bulawayo, Rhodesia (now Zimbabwe). His biological parents are ▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Shortly after birth, Leroux was adopted by Paul and Judith Leroux. He has a sister, Natalie Leroux, born in 1974. In 1984, the Lerouxs emigrated to South Africa to escape the Mugabe regime in Zimbabwe, moving to Krugerdorf approximately 45 minutes outside of Johannesburg. Leroux graduated from technical school in South Africa in 1992.

In 1992, Leroux began working as a programmer in London for Barret Edwards International ("BEI"), principally working on document management systems for BEI clients such as law firms. In approximately 1994, Leroux moved to Sydney, Australia, where he was employed in programming jobs at various banks. In approximately 1998, while Leroux was working for New Era of Networks ("NEON"), he moved to Hong Kong, where he continued working for NEON. In 2000, he returned to London, where he worked again for BEI. While with BEI, Leroux worked on a project in Seattle for approximately six months.

In 2001, Leroux returned to London and began working for Crypto Solutions, designing encryption programs for computer hardware. In 2003, Leroux moved to Rotterdam, where he

worked odd programming jobs until he began working with Secur Star, a company based in Germany owned by Wilfred Heffner.

## II.    The Defendant's Criminal Conduct

Agents and prosecutors have held numerous proffers with Leroux since he first began meeting with the Government. During these sessions, Leroux admitted to the full extent of his prior criminal history, as was required by his cooperation agreement with the Government. The description below is based on the Government's independent investigation and Leroux's proffer admissions.

### A.    Online Pharmacy Business, 2004-2012

From approximately 2004 until his arrest in 2012, Leroux's principal source of revenue was his operation of an online pharmacy business targeting U.S. customers. Tramadol, Soma, and Fioricet comprised the bulk of the online pharmaceutical sales, which were based on prescriptions written by doctors based on online questionnaires submitted by customers. Because these online questionnaire-based prescriptions -- which could be issued by Leroux's doctors without their even viewing the questionnaires -- are legally invalid, the drugs distributed were "misbranded" under the Food, Drug, and Cosmetics Act. (*See* PSR ¶ 16). As discussed in more detail below, Leroux also engaged in various other deceptive and fraudulent conduct in the course of operating the online pharmacy business.

#### 1.    Atlas Pharmacy

In approximately 2004, while Leroux was working for Secur Star, Heffner asked Leroux to do some programming and website design for an online pharmacy business, Atlas Pharmacy, which Hefner was operating separately from Secur Star. Hefner sold prescription drugs (including Xanax, Valium, clonazepam, and anabolic steroids) in the United States through the website. Heffner purchased these drugs from a wholesaler in Brazil by paying bribes to

2

wholesaler employees. In or about 2004, Heffner was arrested in Brazil and asked Leroux to send approximately $40,000 to Brazil so that Heffner could pay bribes to resolve the investigation. Leroux wired the money and Heffner was able to secure his release. (*See* PSR ¶ 17).

### 2.      Rx Limited

Heffner exited the online pharmacy business after his arrest, and Leroux started his own online pharmacy operation, which ultimately became a family of entities generally operating under the name Rx Limited. Rather than supplying drugs directly to consumers, Rx Limited supplied customers with prescriptions for drugs, which would then be shipped to the customer by affiliate pharmacies located in the United States. Customers paid Rx Limited, which in turn paid the doctors writing or approving the prescriptions and the pharmacies filling the orders. (*See* PSR ¶ 18).

Leroux established the Rx Limited business in approximately 2004. Leroux consulted with Martin Dix, Esq., of Ackerman Senterfitt LLP, in Tallahassee, Florida to obtain opinion letters. Leroux described his plan to sell prescription drugs using prescriptions issued based on online questionnaires, but did not fully disclose how and where the business would operate. Dix advised Leroux that the DEA and some courts had taken the position that prescriptions issued based on online questionnaires were not valid, and that Leroux would face the risk that the business could be determined to be unlawful. Dix also discussed the example of Vineet Chhabra, a Floridian who pleaded guilty in the Eastern District of Virginia to a conspiracy to distribute controlled substances (including the Schedule III drug phendimetrazine) using prescriptions issued based on online questionnaires.[1] Dix further advised Leroux that if Leroux entered the

---

[1] *See United States v. Vineet Chhabra et al.*, 03 Cr. 530 (LMB) (E.D. Va.).

online prescription business, he should avoid drugs listed on the schedules to the Controlled Substances Act ("CSA"). Dix advised Leroux that issuing prescriptions for CSA-scheduled drugs would be a federal felony if the prescriptions were determined to be invalid. (*See* PSR ¶ 19). Dix did not advise Leroux on state law.

### 3.      Rx Limited Doctors and Pharmacies

As discussed above, prescriptions for Rx Limited sales were issued by doctors recruited by Rx Limited employees (the "Rx Limited Doctors"). The prescriptions were based on an online questionnaire filled out by the customers, who were assigned to Rx Limited Doctors based on an algorithm intended to keep an approximately equal number of questionnaires in each doctor's queue. Neither customers nor doctors had any control over which doctor the questionnaires went to, and questionnaires from repeat customers were not necessarily routed to the doctors who had previously reviewed their questionnaires. The Rx Limited Doctors were paid for each prescription approved, but were not paid for questionnaires that they reviewed without authorizing a prescription. Rx Limited typically had approximately five to 10 doctors at any given time, and the Rx Limited Doctors typically could approve approximately 50 to 300 prescriptions per day. (*See* PSR ¶ 20). Some Rx Limited Doctors approved up to 1,000 prescriptions per day at times. Some Rx Limited Doctors acted while their licenses were suspended or expired; and at least one acted with a forged medical license.

The prescriptions were filled by affiliate pharmacies, also recruited by Rx Limited employees. . Rx Limited tracked pharmaceutical approvals by Rx Limited Doctors, assigned the orders to Rx Limited affiliate pharmacies for fulfillment, paid shipping costs to deliver the drugs to customers, and calculated and wired the funds due to the Rx Limited Doctors and the affiliate pharmacies. The pharmacies typically were small businesses facing financial difficulties, whose owners were eager for the per-prescription fees paid by Rx Limited. (*See* PSR ¶ 21).

4

### 4.    Rx Limited Drugs and Markets

Rx Limited sold a number of types of prescription drugs through this system. The top sellers were Tramadol, an opioid analgesic;[2] Fioricet, a combination of acetaminophen and butalbital, a barbiturate; and Soma, a brand of the muscle-relaxant carisoprodol. Leroux focused the Rx Limited business on drugs that he believed were not controlled under the CSA. To determine whether a drug was controlled under the CSA, Leroux or one of his employees would compare the generic and brand name of the drug against the schedules on the DEA Diversion Group website. When carisoprodol (Soma) was added to the CSA schedules in January 2012, Rx Limited stopped selling it. (*See* PSR ¶ 22). Some of the drugs Rx Limited distributed were controlled under various states' laws and regulations.

One drug where this screening failed, however, was Fioricet. Soon after forming Rx Limited, Leroux and his employees (largely based in Philippines and Israel) reviewed the CSA schedules and concluded that Fioricet (which contains butalbital) was not itself a scheduled substance, but was controlled only when it also contained codeine or another independently controlled substance. Leroux did not seek a legal opinion, but instructed one of his employees to contact the DEA about the drug's status. The employee advised Leroux that the DEA had told the employee that Fioricet/butalbital was not scheduled unless it contained another scheduled drug, like codeine. Leroux also relied on Rx Limited's affiliate pharmacies to notify Rx Limited when a drug became scheduled at either the federal or state level, because pharmacies typically would not ship controlled substances and required them to be picked up in person. Leroux was never advised that a pharmacy reported that Fioricet was a scheduled drug or that a pharmacy

---

[2] Tramadol was classified as a Schedule IV drug under the CSA on August 18, 2014, *see* 79 Fed. Reg. 37623 (July 2, 2014), after Leroux's arrest, but was noncontrolled during the time of Leroux's offense conduct.

would not ship Fioricet. Despite Leroux's belief to the contrary, Fioricet contains a barbiturate and is, in fact, a controlled substance (*see* PSR ¶ 24; *see also* 21 U.S.C. § 812 Schedule III(b)(1)), though it is exempt from certain provisions of the Controlled Substances Act under 21 C.F.R. § 1308.32. *See United States v. Ricco*, 43 F. Supp. 3d 301, 304-07 (S.D.N.Y. 2014).

Leroux focused the Rx Limited business on states that did not explicitly define what constituted a doctor-patient relationship -- *i.e.*, states where it was at least arguable that a prescription issued based on an online questionnaire, rather than an in-person visit, was valid. As discussed below, as states became more restrictive (or at least, more explicit) in their definitions and the number of jurisdictions of arguable ambiguity fell, Rx Limited grew more willing to sell to states where it was clear that the online-prescription model was not lawful. By 2012, most states prohibited prescriptions based on online questionnaires either by statute or by administrative decision. Despite this, Rx Limited sought to avoid sales in only a handful of states -- Florida, Tennessee, Kentucky, and Nevada -- where Leroux believed internet prescriptions would subject Leroux and his company to state criminal liability. Leroux continued to target states where internet prescriptions carried civil or administrative penalties. (*See* PSR ¶ 25). Rx Limited's operations also violated state laws regarding dispensing prescription medication based on internet questionnaires.

In approximately 2008, Leroux hired two Canadian computer hackers to create spam to generate additional business for the online pharmacy. These individuals also hacked computer servers to obtain customer leads, including servers maintained by health service providers in the United States.

### 5.    Credit Card Processing

Rx Limited relied principally on third-party credit card processors to complete the online drug sales. As state regimes became more restrictive, credit card processing services became

more difficult to obtain. Visa increased its supervision of acquiring banks (banks that process credit card payments for merchants) processing online pharmacy transactions, including by creating transaction codes specifically relating to online pharmacy sales and periodically auditing acquiring banks processing such transactions and their payment processors, requiring that they maintain opinion letters concerning the legality of the merchants' business. (*See* PSR ¶ 26).

Leroux initially obtained supporting opinion letters from Martin Dix. By approximately 2006, however, Dix was no longer willing to provide opinion letters and Leroux turned to Rahulan Kathir, a California attorney. Kathir required Rx Limited to provide him with a letter describing its business. These letters contained what Leroux and Kathir knew to be false information. For example, the letters represented that Rx Limited did not sell Tramadol, because Visa began prohibiting its banks from processing payments for online Tramadol sales. The letters also represented that Rx Limited avoided business in certain states, which was also false. Kathir first charged approximately $10,000 per opinion letter, but increased his fee to as high as $35,000 per letter. Leroux understood that these opinion letters would be provided to Visa by the acquiring banks. Fraudulent opinion letters were provided principally to overseas banks, but also to Harris Bank, an FDIC-insured financial institution, in connection with a denied application to open credit card processing there. (*See* PSR ¶ 27).

In addition to the fraudulent opinion letters, Leroux and his employees created fake online pharmacy websites to show the banks. These sites omitted prohibited drugs like Tramadol; some also purported to require customers to fax in prescriptions from their physicians. Leroux similarly used fake websites for Google's review so that Rx Limited could purchase keywords for Google's AdWords program, which displays keyword-based advertisements for certain search string results. Google began restricting the availability of advertising for online

pharmacy businesses, and the fake websites were intended to allow Rx Limited to evade these restrictions. Leroux accomplished this by determining the IP addresses from which Google employees browsed the web and redirected internet traffic on the Rx Limited websites originating from Google IP addresses to the fake websites. (*See* PSR ¶ 28).

American Express and Discover similarly began requiring that merchants processing online pharmacy sales have valid pharmacy licenses. In order for Rx Limited to accept American Express and Discover payments, Babubhai (Bob) Patel -- the owner of a number of Detroit-area pharmacies and a seller of pharmaceuticals for Rx Limited -- opened merchant accounts with American Express and Discover for the use of Rx Limited. Thus, Patel's licensed pharmacies were nominally the merchant on the accounts, but they were in fact used by Rx Limited. (*See* PSR ¶ 29).

Leroux also bought a pharmacy called G & E Pharmacy and caused G & E to apply to the National Association of Boards of Pharmacy ("NABP") for accreditation as a Verified Internet Pharmacy Practice Site ("VIPPS"). In the application, G & E Pharmacy was identified as a mail-order pharmacy, which Leroux understood to mean a pharmacy where doctors or patients would send legitimate prescriptions by fax or mail to pharmacies in order to fill the order. The G & E Pharmacy VIPPS application was later abandoned. The purpose of the VIPPS application was so that Leroux could open a VIPPS shipping account with FedEx, where Rx Limited was among the largest accounts. In 2011, FedEx closed the account because it had been advised that Rx Limited was shipping controlled substances in violation of federal law. Rx Limited opened a new FedEx account under a different name and continued shipping pharmaceuticals, and also used UPS and another shipper. (*See* PSR ¶ 30).

In addition to the online pharmacy business, Leroux also explored establishing a wholesale drug distributor in the United States, but after taking initial steps abandoned the project because the process of applying for appropriate licenses was too burdensome and intrusive. (*See* PSR ¶ 31).

In approximately October 2011, Leroux caused approximately one-half kilogram of Tramadol powder to be smuggled into the United States aboard a Philippines Airlines flight, using a contact of ████████ (discussed in more detail below). The shipment was a test-run for possible future shipments; Leroux wanted to have the ability to make Tramadol pills in the United States, either for street sales or wholesale. Leroux also sent another 2-4 kilograms through Canada to New York. (*See* PSR ¶ 32).

In approximately 2011, Leroux caused approximately two to three million pills of Tramadol to be smuggled from Mexico to El Paso, Texas, where it was delivered to Tim Vamvakias, a mercenary employed by Leroux and an associate of Joseph Hunter (both discussed in more detail below). The pills remained in a storage site controlled by Vamvakias, available in case Leroux wanted to try to sell them on the street or wholesale at some date in the future.[3] (*See* PSR ¶ 33).

In approximately 2010 and 2011, Leroux bought large quantities of prescription drugs in the Philippines, including approximately 20 million Tramadol pills, 5,000 to 10,000 pills of Hydrocodone, Oxycontin, and Diazepam. Leroux was exploring the viability of smuggling the pills into the United States, but the Indian-manufactured generics that he bought were unsuitable for the U.S. market. (*See* PSR ¶ 34).

---

[3] The Tramadol stash was seized by law enforcement in 2013, with assistance from Leroux.

U.S. pharmacies and doctors who participated in the Rx Limited distribution business were paid by wire transfers originating outside the United States. The wires were designed to disguise the source, origin, ownership and control of the funds and to evade law enforcement detection. Approximately $250 million in funds were laundered through the U.S. financial system in furtherance of the operations of the online drug distribution business, including payments by customers and payments to pharmacies, doctors, marketing affiliates, and shippers. (*See* PSR ¶ 35).

### B.    Weapons Trafficking, 2008-2012

In approximately 2008, Leroux formed Red White & Blue Arms ("RWB") as a weapons dealer in the Philippines. Through RWB, Leroux obtained a variety of handguns, rifles (including combat rifles), rocket-propelled grenade launchers, explosives (including composition 4), and other weapons. Leroux principally sold these weapons in the Philippines to elected and appointed government officials, law enforcement officials, and warlords. The weapons were consigned to the Philippines National Police ("PNP") Firearms and Explosives Division ("FED"), who handled the sales. Leroux also maintained a substantial arsenal of his own that he used to arm security personnel in his employ or that were subcontracted to him. The arsenal was managed by Michael Lontoc. (*See* PSR ¶ 36).

RWB bought some Sig Sauer pistols from the United States in approximately 2008 using an end-user certificate ("EUC") from the PNP. Leroux also explored alternative potential suppliers, including PT Pindad (an arms company in Indonesia) and the Defense Industries Organization ("DIO"), controlled by the Iranian Ministry of Defense for Armed Logistics ("MODAFL").[4] (*See* PSR ¶ 37).

---

[4] The U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated the DIO as a Specially Designated National ("SDN") on March 30, 2007, pursuant to Executive

In late 2008 or early 2009, RWB bought a shipment of rifles and handguns from PT Pindad using an EUC from the FED and one from Mali. David Smith and Joseph Hunter (two mercenaries employed by Leroux, both of which are discussed in more detail below), procured the Mali EUC. Both EUCSs were purchased through bribes. The PT Pindad weapons were loaded on a cargo boat, the merchant vessel "Captain Ufuk," for shipment to the Philippines, where they were to be transferred to the FED for sale to a warlord in the Southern Philippines who was allied with the Arroyo government. While the Captain Ufuk was docked in Mariveles, Philippines, in approximately August 2009, a local reported the boat to authorities. The Philippines Coast Guard raided the Captain Ufuk and seized the weapons on board. Prior to the raid, some of the weapons were offloaded to one of Leroux's yachts, and ultimately moved to the house of a man named Henry Chu. Smith and Bruce Jones, the boat captain, were arrested and Leroux bribed their release from custody. (*See* PSR ¶ 38).

In approximately late 2008, Leroux instructed one of his employees, Nestor Del Rosario, to make contact with the Iranian DIO. Del Rosario, one of Del Rosario's assistants named Rogelio "Ogie" Palma, and others traveled to Tehran to meet the DIO and explore purchasing weapons. The team obtained a weapons catalogue and instructions from the DIO that they required an EUC from an African military general to lend the air of legitimacy to the EUC. During discussions with the DIO, and over the course of several trips to Tehran, the RWB team began discussing the DIO's needs for military components, including gyroscopes, missile

---

Order 13382, which targets proliferators of weapons of mass destruction. The DIO was also sanctioned pursuant to U.N. Security Council Resolution ("UNSCR") 1737 on December 23, 2006 as an entity linked to Iran's proliferation-sensitive nuclear activities or Iran's development of nuclear weapon delivery systems.

OFAC designated MODAFL as an SDN on October 25, 2007 under Executive Order 13382 based on its authority over Iran's ballistic missile research, development, and production activities. MODAFL similarly was sanctioned pursuant to UNSCR 1737.

guidance systems, supersonic wind tunnels, and other materials. (*See* PSR ¶ 39). Leroux's involvement in weapons development for Iran will be discussed in more detail below.

In 2012, as part of an undercover investigation by the DEA, a confidential source (the "CS") represented to Leroux that the Shan State -- a non-governmental semi-autonomous military group in Burma -- wanted to buy surface-to-air missiles in order to combat U.N. and DEA drug crop eradication efforts. Leroux spoke to Phil Shackles, an associate involved in drug trafficking (discussed in more detail below) about procuring the missiles from a group of Serbians. Leroux and Shackels at the time were arranging a cocaine deal with the Serbian group, and Shackels advised Leroux that the Serbians would not discuss a weapons deal until the cocaine deal was completed. Leroux considered trying to get the SAMs from Poly Technologies ("Polytech"), a Chinese weapons manufacturer, but Polytech would require an EUC and the CS advised Leroux that the Shan State would not provide an EUC. Leroux's preliminary efforts to identify a source of SAMs for sale to the Shan State do not amount to a conspiracy or attempt to violate U.S. law. (*See* PSR ¶ 40).

**C.    Weapons Development for Iran, 2009-2012**

As discussed above, while exploring weapons procurement from the Iranian DIO, Leroux began discussions with the DIO through his employees about commodities and technology that Leroux could supply to the DIO. The DIO initially expressed interest in high-quality components for designing and building missiles and missile guidance systems, such as ring laser gyros, supersonic wind tunnels, and vibration platforms. Leroux recommended against seeking to procure these kinds of technologies for two reasons. First, they typically were only available from the U.S. and the DIO would never be able to procure sufficient quantities to supply the Iranian military. Second, Iran lacked the engineering capacity to build the components themselves, even if they were able to reverse-engineer U.S.-sourced samples. (*See* PSR ¶ 41).

Leroux proposed developing technologies for the Iranian military that were an improvement over their existing capabilities and which were of sufficiently simple design, or based on widely available components, such that they could readily be reproduced by Iranian engineers. The DIO expressed an interest in developing, among other things, (1) an explosives formula based on unmonitored materials; (2) enhanced missile guidance systems; (3) design specifications and performance measurements for the American-made AIM-54 Phoenix air-to-air missile.[5] The DIO also expressed interest in vibration platforms and supersonic wind tunnels. The DIO would pay Leroux to develop the technologies of interest by delivering gold to Leroux in a Muslim nation of Leroux's choosing. (*See* PSR ¶ 42).

In approximately 2010, based on the DIO's expressed interest, Leroux began assembling a team of engineers to work on the projects.[6] Leroux already had some computer programmers and engineers in his employ, who were used for various projects in the Philippines. For example, at the time a programmer and an electrical engineer were engaged in a project to design a private, mobile "listening station" that could intercept cellphone communications. Leroux intended to use the listening station to intercept Philippines law enforcement as a means of developing intelligence and protecting himself from extortion by law enforcement. These engineers, along with a team of engineers hired from Romania, were tasked with various research and development projects. Leroux camouflaged the true nature of the research and development by advising the engineering team that he was developing an unmanned aerial vehicle ("UAV"), or

---

[5] Iran later reportedly developed an air-to-air missile based on the Phoenix design that went into production in 2018.

[6] The DIO asked for the team to be based in Tehran, but Leroux demurred on the grounds that the engineers were largely European and would be too conspicuous traveling in and out of Iran. Leroux set the engineering team up in office space in Manila, Philippines. (*See* PSR ¶ 43 n.5).

drone, to conduct surveillance for exploring for mineral deposits in the southern Philippines. (*See* PSR ¶ 43).

In approximately late 2010, Leroux's team developed a recipe for explosives based on unmonitored precursors, principally on coffee sweetener and erythritol tetranitrate ("ETN"), a chemical relative of pentaerythritol tetranitrate ("PETN"), which is used to make plastic explosives. The engineers also developed designs related to the missile project. Leroux sent the designs to the DIO through his employees; after a few days, the DIO reported back that they were pleased with the explosives formula but not the missile-related designs. Leroux and the DIO made arrangements for the DIO to pay Leroux approximately 5 million dollars' worth of gold bars off the coast of Indonesia. Dave Smith received the gold on one of Leroux's yachts.[7] (*See* PSR ¶ 44).

In approximately 2011, Leroux gave the DIO file transfer protocol (FTP) access to a portion of the servers used to store records relating to the research and development projects so that the designs could be accessed remotely, rather than Leroux's employees having to physically travel to Iran in order to deliver the designs. Leroux caused the servers to be configured so that there was no record or log documenting when or by whom the servers were accessed. (*See* PSR ¶ 45).

At the time of his arrest, Leroux's team of engineers was continuing to work on a number of development projects for the Iranian deal, including performance testing of the Phoenix missile and the development of a long-range cruise missile with similar specifications to the Tomahawk missile. As part of the cruise missile project, the engineering team was working to

---

[7] As discussed below, Leroux later came to learn that Smith stole most or all of the gold, which led to a number of contract murders as part of Leroux's quest to locate and recover the gold.

create GPS navigation components that would function outside limits set by the International Traffic in Arms Regulation ("ITAR"). GPS systems that, inter alia, produce navigation results when traveling at a velocity of 1000 knots or greater, or at an altitude above 60,000 feet, are subject to the United States Munitions List ("USML"), Category XV(c)(2). (*See* PSR ¶ 46).

In connection with the research and development projects for the DIO, Leroux procured numerous components from the U.S. Leroux placed orders through Jonathan Wall, a resident of Kentucky who was Leroux's principal procurement agent. Leroux believes that the components themselves were not subject to export controls, and he advised Wall to avoid export-restricted items in order to avoid drawing law enforcement scrutiny. The components were used or intended to be used, however, in the design, construction, and testing of technologies being developed for the DIO. Among the U.S.-sourced commodities and equipment were: Honeywell jet engines for testing purposes; X-Plane flight simulator software; GPS chips; a HEATCON carbon fiber oven; potassium perchlorate, nitric acid, and liquid mercury from United Nuclear; a fume hood; vacuum pumping equipment; a desiccator; nichrome wire; a VectorNav inertial measurement unit ("IMU"); a fiberoptic gyro; a piezoelectric vibration platform; numerous electronic and mechanical components, including engine valves, sensors, micro controllers, resistors, capacitors, and electric switches, etc. (*See* PSR ¶ 47).

### D.    Narcotics and Controlled Substances Trafficking, 2009-2012

In approximately 2010, Leroux bought approximately 48 kilograms of methamphetamine through an individual known to him as "Kelly," Allan Kelly Reyes Peralta. Kelly had an associate that Leroux understood to be a representative or leader of the Asian Triad organized crime gang in the Philippines, whom Kelly referred to as "Joe," Ye Tiong Tan Lim. Kelly reported that the methamphetamine was supplied through the Triads by North Korea, and that North Korea had the production capacity to supply up to six tons of methamphetamine per

15

month. The price for the 48 kilograms was approximately $60,000 per kilogram, which Leroux thought was excessive but which he was willing to pay because he anticipated that his relationship with Kelly and the Triads would give him access to weapons and to a submarine. (*See* PSR ¶ 48).

In addition to supplying methamphetamine, Kelly purported to have connections to Polytech, a Chinese weapons maker. Leroux wanted to be able to buy surface-to-air missiles, to use for components and analysis in connection with his R&D projects for the DIO. Kelly provided Leroux with Polytech weapons catalogues, but Leroux never placed an order because Polytech required an EUC for the weapons and Leroux did not have a source for a SAMs EUC. (*See* PSR ¶ 49).

Kelly also reported that he could broker the procurement of a North Korean submarine, and sent Leroux a photograph of a North Korean-flagged submarine which was purportedly for sale. Leroux was interested in a submarine because many of the chemicals he was buying for the DIO R&D projects (such as rocket fuel components and igniters) were export- and import-controlled in Asia. In order to avoid customs, Leroux planned to import large quantities of these chemicals into the Philippines from China or elsewhere in Southeast Asia using a submarine. Leroux ultimately did not pursue the North Korean submarine because the asking price -- approximately $5 million -- was too high. Leroux instead began designing a 10-meter and a 30-meter submarine that his team could build in the Philippines, and began construction on a submarine dockyard on coastal land Leroux owns in a remote part of the Batangas province south of Manila. (*See* PSR ¶ 50).

Between approximately 2010 and early 2012, Leroux bought approximately 20 to 30 kilograms of cocaine from the Philippines Drug Enforcement Agency ("PDEA") through a

former employee of the Philippines National Bureau of Investigation ("NBI"). Leroux believed that the cocaine was recovered by the PDEA from a shipment of cocaine that was lost at sea and washed up in the Cimarron in Philippines. Leroux bought the cocaine in order to resell it to the Triads, but several kilograms were sham and the quality of the remaining kilograms was too poor. In 2011, Leroux shipped approximately 11 kilograms of the cocaine to Thailand and approximately 10 kilograms to Hong Kong aboard one of his yachts. (*See* PSR ¶ 51).

David Smith introduced Leroux to Scott Stammers, a/k/a "Shawn," a British national, who Leroux understood to traffic cocaine from Thailand to Australia. Leroux worked with Stammers and Shackels on various drug and weapons deals. For example, Shackels stored the methamphetamine Leroux bought from the Triads, storing approximately half in the Philippines and half in Thailand. Stammers was to sell the Thai methamphetamine, but could not get a price high enough to justify the sale. Shackels also stored the cocaine shipped to Hong Kong. (*See* PSR ¶ 52).

In approximately 2011, Stammers proposed partnering with a Cambodian general to produce methamphetamine in Cambodia for distribution in Southeast Asia. Stammers negotiated with the general for protection for the production operation, but the plan did not go forward because Shackels couldn't get the methamphetamine to crystalize using the chemicals that Leroux had available. (*See* PSR ¶ 53).

In early 2012, Leroux arranged two cocaine deals with suppliers in Peru and Ecuador. Shackels arranged Leroux's purchase of approximately 150 kilograms of cocaine sourced from Peru through a Serbian group. The cocaine, along with additional kilograms of the Serbians', was loaded onto the "Jereve," one of Leroux's sailboats. The Jereve set sail for the Philippines under the captaincy of Ivan Vaclavik. In November of 2012, the sailboat was found beached on

the Pacific island of Tonga, with the boat captain missing and a dead body aboard (not, apparently, Vaclavik's). Australian police recovered approximately 200 kilograms of cocaine from the shipwreck. (*See* PSR ¶ 54).

Through an Israeli associate, Benyamin Cohen, a/k/a "Big," Leroux negotiated a purchase of approximately 50 kilograms of cocaine sourced from Ecuador. The cocaine was to be loaded on another of Leroux's sailboats and shipped to the Philippines, but the mast broke and the sailboat remained docked in Ecuador. (*See* PSR ¶ 55).

As part of the DEA's investigation of Leroux, in 2012 confidential sources represented to Leroux that a South American drug trafficking organization wanted to buy methamphetamine from Leroux for delivery to Liberia, from where it would be further distributed to Europe and the United States. Leroux agreed to supply methamphetamine in exchange for cocaine, which Leroux intended to supply to the Triads in order to get better prices for methamphetamine. Leroux also offered to supply the organization with laboratory facilities, chemicals, and a chemist to produce methamphetamine, and emailed the CSes designs for methamphetamine production facilities. A co-conspirator, Shai Reuven, discussed with Leroux on an intercepted telephone call the purported South American organization's distribution in the United States and the potential use of these distribution channels for street sales of Soma, and Reuven agreed to procure a methamphetamine cook for the organization. Leroux also offered to supply the CSes' organization with chemicals needed to produce cocaine from unprocessed cocaine base. During the negotiations concerning the drug transaction, Leroux caused an associate to send sample of approximately 24 grams of methamphetamine from the Philippines to Liberia, for the purpose of having the sample further transported to the United States for testing by the organization. Leroux ultimately proposed to supply the CSes' organization with 100 kilograms of methamphetamine

for importation to the United States, in exchange for 100 kilograms of cocaine. In September 2012, Leroux travelled to Liberia to meet with the CSes to finalize the details of the drug transaction. After his arrival in Liberia, Leroux was arrested by Liberian law enforcement authorities and expelled to the custody of the DEA. (*See* PSR ¶ 56).

### E.   Public Corruption in the Philippines and Elsewhere

While in the Philippines and engaged in various ventures around the globe, Leroux made and directed the payments of bribe money -- for protection, for information, to avoid customs or other regulatory inspections or oversight, to obtain permits or other approvals, and to influence judicial proceedings. (*See* PSR ¶ 57).

**The Philippines**. Leroux describes the Philippines as a highly corrupt nation, where Leroux had contacts at high levels of the Department of Foreign Affairs, the National Bureau of Investigation ("NBI"), the Department of Justice ("PDOJ"), and the Philippines National Police ("PNP"). Leroux's payments to public and law enforcement officials were both bribes to influence the actions of government officials, and also the result of extortion to avoid retaliation or unwanted governmental action against Leroux or his organization. (*See* PSR ¶ 58).

Among the corrupt connections Leroux had in the Philippines were an individual who worked at the Department of Foreign Affairs that Leroux referred to as the "Dragnet Man," who sold Leroux sensitive diplomatic and law enforcement information. The Dragnet Man obtained information from embassies and showed Leroux redacted versions, with unredacted reports available for a price. Leroux saw and purchased law enforcement reports from the United States (including DEA and FBI reports and requests for legal assistance) and Australia. Leroux has also seen from the Dragnet Man dossiers on particular diplomatic personnel, including law enforcement liaisons and U.S. embassy personnel. (*See* PSR ¶ 59).

19

Leroux paid bribes to a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ principally through ▮▮▮▮▮▮ representative ▮▮▮▮▮▮ a lawyer. Leroux calls ▮▮▮▮▮ "the Drunk" because he is an alcoholic ▮▮▮▮ originally assigned David Smith, who worked for ▮▮▮▮ as security for Leroux. Leroux paid Smith a salary and bonuses, understanding that Smith would pay ▮▮▮▮▮▮▮▮▮▮ David Smith told Leroux that ▮▮▮▮▮ was responsible for arranging non-judicial killings for the Philippines government. In approximately 2011, Leroux and ▮▮▮▮▮ went into business together, with Leroux establishing ▮▮▮▮ as the head of a Philippines company that imported pharmaceuticals and chemicals. Leroux bought chemicals from ▮▮▮▮▮ company. ▮▮▮▮▮ arranged the sale to Leroux of TNT, C4, Claymore mines (believed to be from the Armed Forces of the Philippines). ▮▮▮▮▮▮▮▮▮ provided Leroux the contacts in Philippines Airlines who smuggled Tramadol powder into the United States. (*See* PSR ¶ 60).

In approximately 2010, Leroux met with ▮▮▮▮▮▮ then the ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ For ▮▮▮▮▮ protection against interference with Leroux's arms business and pharmaceutical call centers, Leroux arranged to pay ▮▮▮▮ approximately 1 million Philippines pesos per month over the course of approximately a year, along with other miscellaneous payments. Leroux made the payments to ▮▮▮▮ through an NBI agent named ▮▮▮▮ (*See* PSR ¶ 61).

Conrad Najera is a former NBI agent that Leroux used as a connection to the NBI and the PNP Firearms and Explosives Division. In the aftermath of the Captain Ufuk raid and seizure, Leroux paid Najera approximately 50 million Philippines pesos (approximately $1.2 million) to interfere with the resulting investigation and to obtain the release from custody of David Smith and Bruce Jones. (*See* PSR ¶ 62).

Leroux paid a PNP Criminal Investigation and Detection ("CIDG") Group officer named Chris for information and law enforcement reports. After Michael Lontoc, Leroux's manager of RWB, was murdered in 2011, Chris told Leroux that Lontoc was killed by two PNP generals because Lontoc was getting involved in illegal gambling in competition with the illegal gambling controlled by the two generals. (*See* PSR ¶ 63).

**Cambodia**. As discussed above (*supra* at 17), Leroux and Stammers explored establishing methamphetamine production in Cambodia under the protection of a Cambodian general. While Stammers negotiated terms with the general, the venture did not get off the ground. (*See* PSR ¶ 64).

**Africa and South America**. Leroux has engaged in numerous gold and timber ventures in Africa, in connection with which he has caused bribes to be paid in Benin, Mali, Ghana, the Congo, the Democratic Republic of Congo, Zimbabwe, and Zambia for permits, favorable customs treatment, and similar purposes. (*See* PSR ¶ 65).

Leroux has also paid individuals to obtain fraudulent government-issued passports in South Africa, Zimbabwe, Kenya, and Tanzania, understanding that bribes would be paid to obtain the passports. (*See* PSR ¶ 66).

As discussed above (*supra* at 10), Leroux obtained a fraudulent government-issued EUC for weapons from Mali through bribery. Leroux has also given money to an attorney in South Africa named Billy Mentjes for the purpose of obtaining a fraudulent government-issued EUC for pseudoephedrine. (*See* PSR ¶ 67).

Through an individual named ███████████████████ and another named ███████ ████████████████████ Leroux sought to arrange for diplomatic status in Swaziland so that Leroux could attempt to avoid prosecution or extradition in the event his arrest was

sought in the Philippines, the United States, or elsewhere. Leroux arranged for bribes to be paid to the King of Swaziland, although he did not ultimately get the diplomatic status he sought. (*See* PSR ¶ 68).

In approximately 2007 or 2008, Leroux received a message from one of his Israeli employees that a friend (possibly a business associate) of Jacob Kobi Alexander sought Leroux's assistance in helping Alexander avoid extradition to the United States from Namibia. Alexander, the former CEO of Comverse Technology, is indicted in the Eastern District of New York on securities fraud and other charges relating to his conduct at Comverse. Leroux agreed, knowing Alexander to be an extremely wealthy individual and expecting that Alexander would later compensate him. Leroux flew approximately $750,000 in cash to South Africa, where he gave the money to ███████████ drove to Namibia and, on his return, informed Leroux that he had paid the money to the office of the President of Namibia. Leroux learned that the extradition proceedings were thereafter delayed, possibly because the judge overseeing the proceedings was replaced. ██████ died shortly thereafter of heart disease, and Leroux did not have any further contact with Alexander or his associates and was not been paid back for the $750,000. (*See* PSR ¶ 69).

### F.    Murders and Violence

#### 1.    Leroux's Mercenary Team and Acts of Violence

In approximately 2008, Leroux hired a team of mercenaries, including Hunter, Samia, Timothy Vamvakias, and others, to complete acts of violence, including kidnapping and murder, across the world. All of these men accepted positions Leroux's team of mercenaries on the understanding that they may be required to engage in acts of violence, including murder, to protect or recover Leroux's assets. The mercenary team operated under the name of a front company, Echelon Associates. Hunter was recruited for this job because of his military

background and Samia for his tactical weapons training. Initially, Hunter's and Samia's work for

Leroux focused on providing so-called "security" for individuals seeking to purchase gold in

Africa on behalf of Leroux in connection with an asset-based money laundering scheme. (*See*

PSR ¶ 71).

Samia engaged in smuggling and agreed to commit acts of violence for Leroux as part of

the Echelon mercenary team. In 2008, under the auspices of Echelon, Samia traveled to the

Philippines, Hong Kong, Papua New Guinea, the Democratic Republic of the Congo, and the

Republic of the Congo. In a subsequent email to a fellow mercenary, John O'Donoghue, Samia

described his activities with Echelon as involving, among other things, "ground combat with

many threats (whether it be with Indigenous people of the area [or] individuals with interest in

our princip[al] and assets)." O'Donoghue told Vamvakias that in 2008 he and Samia surveilled a

target in Papua New Guinea from a boat using high-powered rifles outfitted with long-range

scopes, and that he and Samia were directed to murder a target, but that O'Donoghue declined

the assignment. (*See* PSR ¶ 72).

Hunter engaged in acts of violence for Leroux as part of the Echelon mercenary team. In

connection with gold-related disputes in approximately 2008 and 2009, Hunter shot a co-

conspirator named Steve Hope Hahn in the hand, and participated in attempted murders that

included the firebombing of a co-conspirator's home and throwing a grenade inside another co-

conspirator's residence. Hunter also engaged in weapons-trafficking activities in multiple

countries on behalf of Leroux, including by helping corruptly to obtain end-user certificates for

the weaponry transported on the Captain Ufuk. Hunter also investigated the possibility of

organizing a coup d'état against the government of the Seychelles. As depicted on a video of

Hunter surreptitiously recorded in Thailand (the "Thailand Video"), Hunter described these

activities—as well as the murder of Catherine Lee and a second Philippines victim named Noemi Edillor—as being "just like you're in war" and akin to a "James Bond movies."

### 2.   Murder of Bruce Jones, Captain of the M/V Captain Ufuk

As discussed above (*supra* at 11), in approximately August 2009, Philippines law enforcement raided the vessel Captain Ufuk and seized weapons that Leroux had purchased from PT Pindad using EUCs obtained from Mali and from the Philippines FED. The captain of the Captain Ufuk, Bruce Jones, was arrested in connection with the raid and Leroux paid bribes for his release. Joe Frank Zuñiga, a Philippines attorney, was hired to represent Jones. Jones became unpredictable, for example, giving interviews on Philippines television about the weapons deal, implicating Leroux as well as Philippines governmental and law enforcement officials. (*See* PSR ¶ 73).

David Smith began talking about having Jones killed, and also talked about having Zuñiga killed for taking money without controlling Jones' unpredictable behavior. In approximately 2010, Leroux negotiated with Zuñiga a payment for Jones' silence. Smith told Leroux to deliver 7 million Philippines pesos to "Razz" -- a prostitute, an employee Philippines organized crime figure John Nash, and Smith's girlfriend. The purported purpose of the payment was for to Zuñiga use to buy Jones' silence, but Leroux believed that there was a strong probability that this payment was actually for a contract murder. Leroux later got a call from Smith advising him that Jones would not be a problem anymore, and Leroux learned from the press that Jones had been shot in Angeles, a city north of Manila where Nash operated. As discussed below, Nash later claimed to have arranged for the 2011 murder of Zuñiga, for which Leroux paid. (*See* PSR ¶ 74).

### 3.    Murder of Herbert Chu

In 2010, Leroux had become suspicious of David Smith's unexplained wealth. An ex-girlfriend of Smith's told Leroux that Smith had stolen Leroux's gold and was planning to kidnap and kill Leroux in order to take more money from him. Leroux decided to try to learn the whereabouts of the gold from Herbert Chu, a friend of Smith's who had stored the weapons saved from the Captain Ufuk raid. Leroux believed that Chu would have stored the stolen gold for Smith or would know where Smith had stored it. Leroux hired Marius Malherbe, a/k/a "Marcus," a South African contract killer, to help him interrogate and kill Chu. Employing a ruse, Leroux told Chu that they needed to move him to a safe house on an island in order to protect Chu from attention in connection with the Captain Ufuk raid. Leroux, Marcus, and Chu boarded a boat to get to the island and, during the trip, Leroux tasered Chu and Marcus threw Chu into the water. Leroux interrogated Chu about the whereabouts of the stolen gold, and Chu told Leroux that Chito, another of Smith's and Chu's friends, was helping Smith with the gold. Marcus then handcuffed Chu and, using a Colt .45 that Leroux had supplied from the RWB armory, shot and killed Chu. Marcus then weighted the body with the boat's anchor and sunk it. (*See* PSR ¶ 75).

### 4.    Murder of David Smith

With Marcus having heard from Chu about the stolen gold, Leroux offered Marcus a 10% finder's fee if Marcus helped Leroux track the gold down. Marcus agreed. David Smith was the next target. (*See* PSR ¶ 76).

Again employing a ruse, Leroux told Smith that he had agreed to bury $2 million in cash on Leroux's Batangas property for a friend of Leroux's who needed the money temporarily hidden. Marcus and Smith drove out to the property with a locked safe loaded with weights approximating the weight of $2 million in cash. Leroux followed Marcus and Smith in a separate

car. Upon Leroux's arrival at the property, Marcus shot Smith with a 9mm that Leroux had supplied to him from the RWB armory. The shot was not fatal and the 9mm jammed; both Leroux and Marcus worked to clear the jam and Marcus was able to clear it. Marcus shot Smith approximately 5 or 6 times in the head, killing him. Leroux then shot Smith's body approximately 3 times with an MP5 that Leroux had brought. (*See* PSR ¶ 77).

Marcus wrapped Smith's corpse in a tarp and loaded it onto a boat that was docked at the Batangas property. Marcus and Leroux drove the boat out from shore and sank the corpse using an outboard motor from a dinghy. Leroux later instructed his employees to report the motor stolen because, if Smith's body were discovered, the serial number of the motor used to anchor the body would be traceable to him. (*See* PSR ¶ 78).

Smith's disappearance is known in the Philippines, but his body has not been found.

### 5.     Murder of Chito

After Smith's murder, Leroux and Marcus targeted Chito. Marcus and Leroux met Chito, put him in a car, and drove with him to Batangas. Chito, perceiving the danger to himself, became afraid and told Leroux and Marcus about the stolen gold. According to Chito, Smith sold the gold through a broker who thought that Smith was giving sale orders on Leroux's behalf. Leroux and Marcus put Chito on a boat that was docked at the Batangas property and drove the boat away from shore. Leroux displayed a stun stick, intending to stun Chito and have Marcus throw Chito into the water for further interrogation. Chito, however, seeing the stun stick, leapt into the water and clung to the boat's hull, pleading for his life. A passenger ferry approached Leroux's boat, and Marcus shot Chito so that he would not be seen or heard by the ferry passengers. Marcus used a Colt .45 with a silencer, supplied by Leroux. Marcus tied the boat's anchor to Chito's body and sank it. (*See* PSR ¶ 79).

Leroux paid Marcus approximately $25,000 each for the Smith, Chu, and Chito murders, plus expenses. Marcus was also paid an additional approximately $25,000 representing 10% of the assets recovered from the DIO gold. (*See* PSR ¶ 80).

### 6.    Violence Against Joseph

After Chito's murder, Marcus returned to South Africa for a couple of weeks before returning to the Philippines to continue to assist in Leroux's search for the gold. Leroux and Marcus interviewed many of Smith's associates, including his wife and mistresses; repossessed a house of Smith's that Leroux had paid for; and seized cars, clothing, jewelry, weapons, and other personal possessions. During this investigation, a man from southern Philippines named Joseph returned two empty Pelican cases to Smith's former house; Leroux recognized the cases as those in which the DIO gold had been stored. (*See* PSR ¶ 81).

Leroux asked an individual that Leroux calls "the Accountant" to investigate Joseph and his role in the stolen gold. (The Accountant is discussed in more detail below.) The Accountant caused Joseph's truck to be firebombed, and Joseph disappeared. Joseph later returned. Leroux asked the Accountant to stop looking into Joseph, and asked John Nash to look into him instead. Nash proposed kidnapping Joseph, but Leroux ultimately decided that enough time, energy, and resources had been spent unsuccessfully searching for the remnants of the stolen gold and that it was no longer worthwhile to pursue Joseph. (*See* PSR ¶ 82).

### 7.    Murders of Naomi Edillor and Catherine Lee

In early 2011, Leroux promoted Hunter to take Smith's place as the head of the mercenary teams. Hunter later explained on the Thailand Video that he was "promoted" to take Smith's position after Smith "got killed for stealing money." Hunter recruited Chris DeMeer, a former Leroux mercenary, and Timothy Vamvakias in early 2011. Hunter told DeMeer and

Vamvakias that Leroux had a "list" of people to kill, and that Hunter would be the new manager of the kill teams. (*See* PSR ¶ 83).

Between 2011 and 2012, Hunter managed the deployment of mercenary teams on Leroux's behalf, including to perform murders-for-hire. In February and March 2011, while Hunter was recruiting new members of the kill team and mercenary team, he traveled home to the United States. Hunter returned to the Philippines in March 2011. One of the people that Hunter had killed at Leroux's direction was Noemi Edillor. (*See* PSR ¶ 84).

After Leroux learned about Smith's theft of the DIO gold, Leroux was suspicious of everyone who worked for him and began looking for other occasions when people may have stolen from him. Leroux found another example in the case of Nestor del Rosario, Naomi Edillor, and Catherine Lee. (*See* PSR ¶ 85).

Del Rosario worked for Leroux for several years as one of the managers of RWB and of the online pharmacy business. For example, del Rosario was the leader of the teams that traveled to Tehran to meet with the DIO in connection with RWB's interest in buying DIO-supplied weapons and Leroux's interest in supplying the DIO with military technologies. In approximately 2010 or 2011, del Rosario's subordinate (and later his successor), Rogelio Palmer, a/k/a "Ogie," told Leroux that del Rosario's girlfriend, Janice, had information about del Rosario's thefts. Leroux and his girlfriend met with Janice, who described del Rosario having embezzling substantial amounts of money from Leroux by padding prices on company purchases, from real estate to office supplies. Naomi Edillor was a purchasing manager working with del Rosario, and Catherine Lee was a real estate broker involved in real estate transactions where inflated prices were alleged to be used to embezzle from Leroux. Leroux believes del Rosario stole between approximately $2 million and $4 million. (*See* PSR ¶ 86).

During a later phone call with del Rosario, Leroux told del Rosario in substance that if del Rosario had stolen from Leroux he was a dead man. After this conversation, Leroux lost contact with del Rosario. Edillor also left Leroux's company. (*See* PSR ¶ 87).

Leroux met with Hunter and told him to surveil Edillor and Lee, to get information from them about the money del Rosario stole, and then to kill them. Leroux believed Edillor and Lee also profited from del Rosario's embezzlement, at Leroux's expense. The Edillor murder was executed in June 2011 by Chris DeMeer and another man known as "Daddy Mac." Leroux met with "Daddy Mac" and DeMeer prior to the murder. (*See* PSR ¶ 88).

Hunter later advised Leroux that Edillor had been killed outside her home, but Hunter's men did not obtain any information about del Rosario or money stolen from Leroux. After Edillor was murdered, Hunter sent a news article about Edillor's murder to Leroux, and wrote: "There is your fucking proof. Have my guys money tomorrow!!!!" Leroux then paid Hunter, DeMeer, and Daddy Mac for Edillor's murder. In August 2011, however, Hunter informed Leroux via email that both DeMeer and Mac Daddy were "quitting." (*See* PSR ¶ 89).

In September 2011, Hunter recruited Samia and Carl David Stillwell to be the new kill team. On September 30, 2011, Hunter e-mailed Leroux to confirm that Samia would travel to Brazil to meet with Leroux. Hunter told Leroux that Samia had agreed to be a member of the new kill team at this time, and would travel to Brazil to meet with Leroux to discuss the upcoming murders. In early October 2011, Hunter also told Vamvakias that Samia had been assigned a "bonus job," meaning murder, with a partner. (*See* PSR ¶ 90).

Samia and Stillwell arrived in the Philippines on January 10, 2012, and January 11, 2012, respectively, and participated in efforts to murder four people during the trip: Catherine Lee, Dazl Silverio, Fitch Penalosa, and Manuel Jalos. Documents relating to the defendants' targeting

of each of these individuals were found on electronic devices later seized by the DEA from Samia's home and Stillwell's home in North Carolina. (*See* PSR ¶ 91).

The first target Leroux provided to Hunter, Samia, and Stillwell was Dazl Silvero. Just days after Samia and Stillwell arrived in the Philippines, Hunter wrote to Leroux: "Need another person. The one you gave me is going to take along time. She has four addresses, one of which is an island 200 miles from here. . . . Need someone we can find now, and get it done right away." Leroux then provided a second target: Catherine Lee. (*See* PSR ¶ 92).

On January 17, 2012, Hunter asked Leroux for a "picture of this subject," meaning Catherine Lee. On February 6, 2012, Hunter again asked Leroux for a murder target:

> We are checking on the firsts [sic] subject you gave but they have not been seen and one of the addresses is empty now and for sale. We need a new subject with a photo, address and car plates. If the guys don't have a good photo, everything is put at risk because they have to inquire and find out about the subject and that makes people suspicious. All of these areas are gated, and as soon as the guys park to pull surveillance, within a few minutes the roving patrol comes by and asked them what they are doing. These guys already draw attention, and them sitting somewhere draws even more.

(*See* PSR ¶ 93).

Leroux later provided Hunter, Samia, and Stillwell with target packages for Penalosa and Jalos. In the meantime, Samia and Stillwell conducted surveillance to prepare to murder Catherine Lee. Lee worked in the area of Las Piñas in Manilla metropolitan area. A digital camera seized from the Samia's residence on the day of his arrest contained surveillance photographs of a business where Lee worked, which were taken in late-January 2012. (*See* PSR ¶ 94).

On January 23, 2012, Samia sent an email to Hunter requesting "OP funds" to facilitate preparations for the murder. In a separate email, Hunter requested weapons from Leroux, including a "Rifle Silenced with optics" and a ".22 or 380 Pistol" with a silencer. Hunter later

confirmed that he had received the weapons, requested a "bigger caliber rifle to go along with the small caliber one I received today," and indicated that "Sal" and "JT"—code names for Samia and Stillwell, respectively—would be owed $35,000 if they completed the murder ("Mission Success"). (*See* PSR ¶ 95).

On February 4, 2012, Hunter emailed Leroux to request funds to purchase and modify a computer bag in order to conceal a weapon, and to pay for travel to "this las pinas place" where Lee was located. At the same time, Samia and Stillwell used the cover of posing as potential real estate purchasers in order to establish contact with Lee. (*See* PSR ¶ 96).

On February 12, 2012, Lee met with Samia and Stillwell to show them several real estate properties. Later that day, as Stillwell drove the Toyota Innova van, Samia shot Lee twice in the face using a .22 caliber pistol with a silencer. The two men dumped her body on a pile of garbage. Lee's body was found the following morning, on February 13, 2012. An autopsy examination subsequently determined that Lee died as a result of the gunshot wounds to her face: one gunshot wound under each eye. (*See* PSR ¶ 97).

A cellphone seized from Stillwell on the day of his arrest contained photographs bearing a "Date Modified" of February 12, 2012—*i.e.*, the day that Lee was murdered—that appear to depict, among other things, the Toyota Innova van in which Lee was murdered, and Catherine Lee's head covered in blood. (*See* PSR ¶ 98).

The following day, Hunter informed Leroux that Samia and Stillwell "plan on doing one more"—meaning one more murder—before they returned home to the United States, and came back to the Philippines to commit more murders. On February 14, 2012, Samia sent Hunter an "expense report." Also on February 14, 2012, two days after murdering Lee, Samia wrote in a

Facebook message to another individual that it was "easier to put down a person than a dog." (*See* PSR ¶ 99).

Shortly after Lee's murder, Leroux gave Hunter $35,000 each for Samia and Stillwell in exchange for the murder of Catherine Lee, which Hunter provided to Samia and Stillwell. Between February and March 2012, Samia and Stillwell sent part of the proceeds of the crime back to the United States via structured funds transfers using Western Union to trusted friends and family. (*See* PSR ¶ 100).

### 8.    Murder of Joe Frank Zuñiga

Prior to David Smith's murder, Smith told Leroux about a number of contracts he had put out on various individuals, which Leroux understood to be a reference to bounties that would be paid for those individuals' murders. At least some of these contracts had been placed with John Nash. After Smith's murder, Nash asked Leroux if any of the bounties were still open. Leroux told Nash that they were all closed except for one: Joe Frank Zuñiga, Bruce Jones' lawyer. Later, Nash advised Leroux that Zuñiga had been killed, and showed Leroux a picture on Nash's cell phone of an unidentifiable body covered in plastic. Nash advised that the body had been gotten rid of. Nash owed Leroux at that time, and Leroux agreed to deduct the amount of the bounty from Nash's debt. (*See* PSR ¶ 101).

Prior to Nash's claim of killing Zuñiga, Leroux hired a South African called ▓▓▓▓ for the Zuñiga murder. ▓▓▓▓ claimed to have shot Zuñiga and his maid, but Leroux did not believe him and ▓▓▓▓ eventually admitted that he hadn't carried out the job. ▓▓▓▓ was also hired to detonate Joseph's car, in order to scare Joseph to flee his hometown (which was near a law enforcement base). ▓▓▓▓ claimed to have done so, but again later admitted that he hadn't. (*See* PSR ¶ 102).

Zuñiga's disappearance is known in the Philippines, but his body has not been found.

### 9.    Other assaults, arsons, and violent acts

Leroux and his employees or associates have been involved in several other, non-fatal, acts of violence at Leroux's direction.

In approximately 2008, a real estate broker owed Leroux some money from a condominium transaction. Leroux asked Smith to collect that money, and Smith had surveillance conducted on the broker. Later, Smith told Leroux that he had thrown a grenade at the broker's house. Apparently no one was injured, and Leroux told Smith to stand down. (*See* PSR ¶ 105).

In approximately 2008 or 2009, Smith went to South Africa with Hunter and DeMeer to deal with Steve and Andrew Hahn, two brothers with whom Leroux had entered into a gold buying venture. Leroux had given money to the Hahns to buy gold in Africa, which Leroux intended to export and resell. The Hahns had been introduced to Leroux by his South African cousins, Matthew and Gary Smith, as individuals knowledgeable about the African gold markets. Leroux learned that the Hahn brothers had stolen a large portion of Leroux's money, and instructed David Smith to find out what was going on. Smith, Hunter, and DeMeer conducted surveillance on the Hahns, and Hunter shot Steve Hahn in the hand. (*See* PSR ¶ 106).

The Hahns came to the Philippines to meet with Leroux and try to avoid further retribution. They advised Leroux that they had given most of the stolen money to Leroux's cousins, the Smiths. Leroux and David Smith arranged for Andrew Hahn to be arrested by planting approximately 5 grams of cocaine in his bag. Steven Hahn showed Leroux evidence that Leroux's cousins had received most of the money, sufficient to satisfy Leroux that the Hahns did not have the money. Andrew Hahn was eventually released from prison and the charges dismissed, but it took approximately two to two-and-a-half years. (*See* PSR ¶ 107).

Leroux dispatched David Smith and Hunter back to South Africa to deal with his cousins. David Smith firebombed Matthew Smith's house, though apparently no one was injured. Leroux

33

considered putting out a contract to murder the Smiths or to have them beaten, and sought prices for hired killers from a Zimbabwean associate. Smith told Leroux that he could assemble a team of ex-U.S. Special Forces personnel to carry out murders. Ultimately Leroux concluded that it would be too expensive to have his cousins murdered or beaten and furthermore was reluctant to have family members murdered or beaten. (*See* PSR ¶ 108).

In approximately 2009, Leroux learned that an employee in the online pharmacy business named Moran Oz had stolen from his company. Leroux told David Smith to deal with the situation. Smith, along with Hunter and Demeer, took Oz out on one of Leroux's yachts. At sea, Smith threw Oz into the water and fired a gun into the water around Oz. Smith then pulled Oz back into the yacht and told him not to steal again. Leroux did not know in advance exactly how Smith planned to deal with Oz and, upon learning of the incident, believed that Smith's actions were excessive, but Leroux understood in advance that Smith was likely to employ some form of violence or intimidation. (*See* PSR ¶ 109).

In approximately 2011, Leroux retained Marcus to conduct surveillance on Menchu, a Filipino lawyer. When the Captain Ufuk was seized, a yacht and two rubber boats were also seized. Menchu was given 20 million pesos to recover the boats (likely through paying bribes). The yacht was released but the other two boats were not. David Smith argued that Menchu fell short because he had stolen most of the money, and claimed that he had put a bounty on Menchu. After Smith's murder, Leroux gave the Menchu job to Marcus, who conducted surveillance. Leroux cancelled the job, however, concluding that Smith probably had not given all 20 million pesos to Menchu and had stolen some of the money himself. Leroux also hired Marcus to kill Matthew and Gary Smith, but called the job off after Marcus conducted some surveillance. (*See* PSR ¶ 110).

### 10.   Delivery of Protection Money, Explosives, and Sensitive Information to Suspected NPA Member

In approximately 2010, Leroux embarked on constructing a submarine dock in Batangas (as described above, *supra* at 16). Leroux asked the Dragnet Man to direct him to someone who could provide security and protection in Batangas. The Dragnet Man gave Leroux contact information for an individual that Leroux later came to call the Accountant. Leroux sent an employee to meet with the Accountant to discuss how the Accountant could help protect the submarine dock project and the cost. Leroux learned that the Accountant had several dozen men that appeared to be in his employ or under his command. Leroux arranged for 1.2 million pesos (approximately $290,000) to be delivered to the Accountant and, in exchange, the submarine project was, for a time, free from regulatory or other types of interference. (*See* PSR ¶ 111).

During this time, Leroux also sold the Accountant law enforcement files that Leroux had obtained from the Dragnet Man, including files on Australian AFP and U.S. law enforcement personnel and records from the Philippines National Intelligence Coordinating Agency ("NICA") about counter-terrorism activities in Mindanao. (*See* PSR ¶ 112).

The Accountant later asked if Leroux could supply him with explosives, blasting caps, igniters, and cell phone detonators. Leroux had Lontoc provide the Accountant with C4 from the RWB armory, but Lontoc could not provide cell phone detonators. Leroux built two or three detonators himself for the Accountant. Sometime later, a major bridge in the area was bombed, and the Accountant told Leroux that the bombing was a message to Leroux that he needed to pay more for protection. Leroux negotiated a payment of 50,000 pesos per month (approximately $1,150), which Leroux paid for approximately a year. (*See* PSR ¶ 113).

Leroux inferred that the Accountant had used the cell phone detonators for the bridge bombing and further inferred that the Accountant was likely a member of or associated with the

New People's Army, a communist separatist group in Batangas that is a designated Foreign Terrorist Organization ("FTO"). Leroux made the NPA association because the bridge bombing was consistent in both modus operandi and audacity with the NPA's activities. The NPA is also active in Batangas. Leroux later learned from one of his employees that one of the Accountant's employees said that the Accountant conducted contract bombings. The Accountant himself later told Leroux that the Accountant caused the bombing of a Philex Mining Corp. office building. Thus, Leroux lacked knowledge at the time he supplied the detonators that the recipient was a member of an FTO or an organization engaged in terrorism, though he understood the likelihood that the detonators could be used for acts of violence. (*See* PSR ¶ 114).

### III.    The Information and Guilty Plea

On February 14, 2014, Leroux waived indictment and consented to the filing of an information, S2 12 Cr. 289 (RA) (the "Information"). Leroux also consented to the filing of an information filed in the District of Minnesota, which was transferred to this District pursuant to Rule 20, 14 Cr. 75 (RA) (the "Second Information").[8] Leroux pleaded guilty to the charges in both informations before the Honorable Robert P. Patterson, United States District Judge, pursuant to a cooperation plea agreement.

Count One of the Information charges Leroux with his participation in a conspiracy to distribute 500 grams and more a mixture and substance containing a detectable amount of methamphetamine, knowing and intending that it would be imported to the United States, and to

---

[8] As discussed above, Leroux was arrested in connection with an investigation conducted by the DEA's Special Operations Division and the U.S. Attorney's Office. Leroux and several of his associates were also the subject of an independent diversion investigation being conducted by the DEA's Minneapolis Division Office and the Consumer Protection Branch of the Department of Justice, relating to Rx Limited. At the time of his arrest, Leroux had not yet been charged in connection with this investigation.

import 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine into the United States, from at least in or about April 2012 through in or about September 2012, in violation of Title 21, United States Code, Section 963. This Count is based on Leroux's participation in the narcotics conspiracy that was the subject of the DEA's proactive undercover investigation (*see supra* at 18-19; PSR ¶ 56), and corresponds to the offense charged in the underlying Indictment on which Leroux was arrested.

Count Two of the Information charges Leroux with the unlicensed exportation of goods and technology from the United States to a person in a third country with knowledge that goods and technology were intended for use in the production of or for incorporation into technology and services to be supplied to the Government of Iran, from in or about 2009 through September 2012, in violation of the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1705; and the Iran Transactions and Sanctions Regulations ("ITSR"), Title 31, Code of Federal Regulations, Sections 560.203 and 560.204. This Count is based on Leroux's development of technology for the Iranian military (*see supra* at 11-15; PSR ¶¶ 39 & 41-47), which Leroux accomplished in part by acquiring technological components from the United States for use in building and testing designs for Iran. Count Two further alleges that the murders of Smith (*supra* at 25-26; PSR ¶¶ 76-78); Chu (*supra* at 25; PSR ¶ 75); Chito (*supra* at 26-27; PSR ¶¶ 79-80); Edillor (*supra* at 28-29; PSR ¶¶ 88-89); and Lee (*supra* at 30-32; PSR ¶¶ 88 & 90-100)—all part of Leroux's efforts to obtain or regain proceeds paid by the Government of Iran for the military designs— as well as Leroux's involvement in the solicitation of the murders of Jones (*supra* at 24; PSR ¶¶ 73-74) and Zuñiga (*supra* at 32; PSR ¶¶ 101-03), were overt acts taken in furtherance of the IEEPA conspiracy.

At the time of Leroux's arrest, the investigation by the DEA's Special Operations Division had gathered evidence of Leroux's potential involvement in the murders of Jones, Smith, Edillor, and Lee (among other things) and that aspect of the investigation was ongoing; the evidence, however, was not yet sufficient to support bringing charges against Leroux relating to those crimes. Law enforcement also was aware of some of Leroux's procurement activity involving U.S. technological components, Leroux's involvement in supplying military technology to Iran and his involvement in the murders of Chu and Chito, and the solicitation of the murder of Zuñiga, was not known by law enforcement until Leroux's post-arrest admissions. Similarly, the relationship between the murders and the Iran business was not known to law enforcement until Leroux's post-arrest admissions.

Count Three of the Information charges Leroux with participation in a conspiracy to commit computer hacking, from in or about 2008 through in or about 2011, violation of Title 18, United States Code, Sections 1030(a)(2) and (b). This Count is based on Leroux's involvement in obtaining customer lists from U.S. servers by means of computer hacking. (*See supra* at 6). Leroux's involvement in this offense was not known to law enforcement until Leroux's post-arrest admissions.

Count Four of the Information charges Leroux with assisting an offender, knowing that an offense against the United States had been committed, in order to hinder or prevent the offender's apprehension, trial or punishment, in or about 2008, violation of Title 18, United States Code, Section 3. This Count is based on Leroux's delivery of money for the purpose of bribing a foreign government official to frustrate the extradition of Alexander to face charges filed in the Eastern District of New York. (*See supra* at 22). Leroux's involvement in this offense was not known to law enforcement until Leroux's post-arrest admissions.

Count One of the Second Information charges Leroux with participating in a conspiracy to introduce misbranded drugs and to deliver for introduction into interstate commerce misbranded drugs with intent to defraud and mislead, from in or about 2004 through in or about September 2012, in violation of Title 18, United States Code, Section 371. This Count is based on Leroux's operation of Rx Limited. (*See supra* at 3-10; PSR ¶¶ 16-34). At the time of Leroux's arrest, the investigations by the DEA Minneapolis Division Office and by the Special Operations Division had gathered evidence of Leroux's involvement in these illicit online pharmaceuticals distribution businesses, but charges against Leroux had not yet been filed. In the course of his post-arrest admissions, Leroux provided significant additional information regarding these offenses, as well as access to electronic records of the businesses.

Count Two of the Second Information charges Leroux with participating in a conspiracy to commit mail and wire fraud, from in or about 2004 through in or about September 2012, violation of Title 18, United States Code, Section 1349, based on numerous fraudulent representations made in the course of the operations of the Rx Limited business.

Count Three of the Second Information charges Leroux with participating in a conspiracy to launder money, from in or about 2004 through in or about September 2012, violation of Title 18, United States Code, Section 1956(h). This Count, too, is based on Leroux's conduct of the Atlas Pharmacy and Rx Limited businesses, which involved numerous international transfers of funds from outside the United States to inside the United States to promote the mail and wire fraud offenses charged as part of Count Two of the Second Information.

In addition to Leroux's pleas of guilty to the charges in the Information and the Second Information, pursuant to the plea agreement the parties agree that the other criminal conduct described in the PSR and in this memorandum—which cannot be charged because Leroux's

efforts did not develop to the point of a criminal offense or because federal criminal jurisdiction is lacking—is relevant conduct for purpose of sentencing, including his discussions in or about 2012 about possessing with intent to distribute carisoprodol, a controlled substance; his participation in a conspiracy to possess with intent to distribute cocaine and methamphetamine in the Philippines, Hong Kong, Thailand, Peru, and Ecuador from in or about 2010 through 2012; his participation, as independent substantive crimes, in the murders-for-hire of Jones, Chu, Smith, Chito, Edillor, Lee, and Zuñiga; his participation in a conspiracy to commit assault and arson against Oz, the Hahns, Gary and Matthew Smith, and "Joseph;" his participation in the bribery of foreign government officials in the Philippines, China, Laos, Africa, and Brazil; his discussions in or about 2012 about acquiring surface-to-air missiles; and his conspiring to distribute prescription medications controlled by State law without a valid prescription. Leroux described all of this conduct in his post-arrest admissions. At the time of his arrest, the investigations against him had developed evidence of some, but not all, of these offenses.

## IV.    The Defendant's Substantial Assistance

As described above, the defendant was arrested in connection with an investigation conducted by the DEA's Special Operations Division and the U.S. Attorney's Office of his international drug and weapons trafficking activity. Specifically, as part of a proactive investigation, DEA confidential sources posed as drug traffickers and negotiated with Leroux to sell Leroux cocaine and to buy from Leroux methamphetamine and methamphetamine laboratories and supplies, for importation into the United States; Leroux and the confidential sources also discussed potential weapons deals. As part of that investigation, Leroux travelled to Monrovia, Liberia in September 2012 expecting to meet with the confidential sources to finalize the details of their narcotics agreement. Leroux was arrested by Liberian law enforcement and expelled to the custody of the DEA. (*See supra* at 19; PSR ¶¶ 56, 115).

Leroux initially attempted to resist his arrest in Liberia, refused to comply with efforts to restrain and move him, and attempted to offer a bribe to Liberian law enforcement for his release. After those efforts proved unsuccessful and Leroux was placed on an airplane for transportation to this District, however, Leroux expressed an interest in cooperating with law enforcement, waived his *Miranda* rights, and gave a post-arrest interview. Upon his arrival in the District, Leroux was appointed counsel, waived presentment and arraignment, met with agents and prosecutors, and began engaging in recorded communications with his criminal associates under the supervision of law enforcement. The indictment and the fact of Leroux's arrest remained sealed in order to preserve the appearance that Leroux was at liberty and continuing to engage in criminal conduct.

For the next several months, Leroux met regularly with agents and prosecutors, often as much as three or four times a week for several hours a day. In the course of these meetings, Leroux participated in proffers regarding his criminal past, and also continued engaging in recorded communications with his associates under the supervision of the DEA. Counsel was present for all proffers regarding Leroux's prior conduct. For purposes of engaging in communications with associates, Leroux waived the presence of counsel. As discussed above, at the time of Leroux's arrest in connection with his participation in a conspiracy to import methamphetamine, law enforcement had gathered evidence of his involvement in additional offenses and was continuing to investigate those crimes; in the course of his proffers Leroux both disclosed additional crimes about which law enforcement was not yet aware, and provided significant additional information regarding offenses about which law enforcement was aware. Leroux also provided access to electronic records stored on foreign servers controlled by him,

which contained records relating to his operation of Rx Limited as well as email communications with Hunter and other associates.

In his proffers, Leroux initially withheld his participation in murders and violence. (*See, e.g.*, Tr. 521-22). By the end of October 2012, Leroux admitted his participation in the murders of Jones, Smith, Chu, Chito, Zuñiga, Edillor, and Lee, and provided detailed and corroborated information, as well as electronic records, related to those those offenses that assisted in the prosecution of other individuals. In approximately 2015, Leroux withheld information about his involvement in soliciting Lee's murder and made false statements about his purpose for directing Hunter to hire Samia and Stillwell for murders-for-hire, before providing truthful information regarding the full scope of the offense. The Government assesses that the information that Leroux ultimately provided was truthful and complete to the best of his recollection, heavily corroborated by information provide by other individuals and by records, and significantly assisted the Government in the investigation and prosecution of other individuals, as described below.

The information provided by Leroux was voluminous, detailed, and heavily corroborated, both by evidence that Leroux was aware of and by evidence that Leroux was not aware of or that was later obtained. For example, in approximately early 2012, LeRoux was in Brazil and, while there, his telephone communications were intercepted by Brazilian law enforcement pursuant to court order. During intercepted phone calls and text messages, Leroux communicated with Shai Reuven, Shackels, Vaclavik, and others; and discussed methamphetamine production for the DEA confidential sources, the North Korean-produced methamphetamine Leroux had previously procured, and the Peruvian and Ecuadoran cocaine transactions. As discussed above, shortly

after Leroux's arrest, a vessel carrying Leroux's Peruvian cocaine to the Philippines ran aground in on the Pacific island of Tonga.

As another example, in approximately 2011, Hong Kong authorities seized several hundred kilograms of gold belonging to companies established by Leroux[9] and arrested several of Leroux's associates. Among the evidence that Hong Kong authorities seized in connection with the arrests were notes of one employee who had recently visited South America looking for cocaine suppliers, and documents regarding chemicals and an airplane engine that LeRoux bought for his Iran missile development project.

As another example, with Leroux's assistance, law enforcement was able to seize approximately 30 kilograms of methamphetamine in Thailand and the Philippines, amounts remaining from his 48-kilogram purchase in 2010. Leroux was also able to direct law enforcement to other physical evidence, including the van used by Samia and Stillwell in the murder of Lee in the Philippines.

---

[9] At the direction of the Government, Leroux withdrew his efforts to contest the seizure of this gold. According to Leroux, the value of the gold and bank accounts seized by Hong Kong authorities totaled approximately $14 million.

In addition to historical information and records, Leroux also engaged in communications with various associates in furtherance of ongoing investigations. This assistance ultimately led to the dismantling of Leroux's enterprise and the arrests of over a dozen of his criminal associates. Within a matter of a few weeks following his arrest, at the direction and under the supervision of law enforcement, Leroux arranged to shut down Rx Limited, reducing his employees from at least approximately 600 individuals in Israel and the Philippines to a handful of staff and ending the unlawful distribution of prescription medications. Also at the Government's direction, Leroux did not contest the freezing or seizure of business assets located overseas, including the gold seized in Hong Kong. Most significantly, Leroux arranged for the introduction of DEA confidential sources to his criminal associates.

### A.  Joseph Hunter, Timothy Vamvakias, Dennis Gogel, Slowamir Soborski, and Michael Filter

Leroux arranged the introduction of DEA confidential sources to his head of security and kill team organizer, Joseph Hunter, in January 2013, describing the sources as South American drug-trafficking partners of Leroux's, involved in the importation of cocaine into the United States. Hunter had been a member of Leroux's mercenary team since approximately 2008, and since Smith's murder had been the head of Leroux's security operations and oversaw the teams that committed the murders of Edillor and Lee. Over the course of the following nine months, Hunter recruited a team of former military to act as mercenaries for the CSes' purported drug cartel—Vamvakias, a former U.S. Army officer; Gogel and Filer, former members of the German military; and Soborski, a former member of the Polish military and counterterrorism officer. Led by Hunter, the team engaged in various operations for the purported cartel, including the surveillance in March 2013 of one of Leroux's boats docked in Thailand, which was represented to be used for the transportation of narcotics; providing counter-surveillance and

security in April 2013 for meetings between the confidential sources and drug trafficking targets in Mauritius, Africa; the surveillance in June 2013 of an airplane departure from the Bahamas to the United States purportedly loaded with several hundred kilograms of the cartel's cocaine; and a conspiracy to commit the murders-for-hire of a purported DEA special agent and confidential source in Africa in September 2013. The defendants ultimately were charged with narcotics offenses and, with respect to Hunter, Vamvakias, and Gogel, participation in a conspiracy to murder a DEA agent and informant. *See generally United States v. Hunter et al.*, S7 13 Cr. 521 (RA), Dkt. Entry No. 23 (S.D.N.Y. Sep. 30, 2013) (seventh superseding indictment).[11]

In addition to introducing the DEA confidential sources to Hunter and his mercenary team, Leroux substantially assisted this undercover investigation in a number of other ways. First, Leroux maintained regular contact with Hunter by phone and electronic communication (recorded and preserved), under the supervision of the DEA. Second, Leroux gave consent for DEA agents to assume his identity in electronic communications, so that agents could communicate with Hunter and others posing as Leroux. Third, Leroux provided access to his properties and assets in the Philippines and Thailand for use in furtherance of the investigation. For example, Hunter, Gogel, Soborski, and Filter stayed at a property owned by Leroux (through a nominee) in Thailand in early 2013, and Leroux consented to the installation of recording equipment by Thai law enforcement. Leroux's boat, the "Captain Fog," was the subject of the defendant's surveillance in March 2013.[12] Leroux also used funds generated by his online

---

[11] The investigation also targeted other members of the mercenary crew, such as Chris DeMeer, and Leroux's hitman Malherbe. Those individuals, however, were unwilling or unable to accept work purportedly on Leroux's behalf.

[12] In connection with a separate investigation being conducted by the DEA Special Operations Division, defendants in South America and Africa were charged with narcotics trafficking and narcoterrorism offenses arising out of their agreement to assist in the distribution of cocaine purportedly owned by the *Fuerzas Armadas Revolucionarias de Colombia* (FARC) through

pharmacy business to pay salaries and expenses for the team, totaling approximately $500,000 over the course of the year-long undercover investigation.

The five defendants were arrested on September 27, 2013, as part of a coordinated takedown along with five additional defendants, as discussed below. Hunter was arrested in Thailand, Vamvakias and Gogel were arrested in Kenya, and Soborski and Filter were arrested in Estonia. Following their extraditions or expulsions to the United States for prosecution, each of the five defendants pleaded guilty to the offenses with which they were charged.

### B.    Ye Tiong Tan Lim, Kelly Peralta, Phillip Shackels, Stammers, and Adrian Valkovic

Leroux also introduced DEA confidential sources to his narcotics partners, in particular, Tan Lim, Kelly, and Stammers. Tan Lim, a Philippines-based representative of a Triad organized crime group operating in Hong Kong, brokered Leroux's purchase in 2010 of approximately 48 kilograms of virtually pure methamphetamine that Tan Lim's organization procured from North Korea. Kelly was Tan Lim's associate and also involved in the methamphetamine deal, and Stammers and Shackels were also involved in Leroux's drug efforts. By January 2013, the CSes were introduced to Tan Lim, Kelly, and Stammers, and Shackels; Valkovic was later recruited by the crew. The DEA sources purported that their South American cartel had already sold some of the 48 kilograms of North Korean methamphetamine in the United States, and wanted to buy significant additional quantities for the same market. The DEA confidential sources also described their cartel's interest in procuring weapons, which the defendants—in particular,

---

Guinea Bissau, including providing military support and supplying weapons for the FARC. *See United States v. Mane et ano*, S7 12 Cr. 839 (JSR), Dkt. Entry No. 16 (S.D.N.Y. April 5, 2013) (superseding indictment). Leroux provided a vessel for use by law enforcement agents in connection with a ruse meeting with defendants in 2013, for arrest and prosecution in the United States. During the meeting, rough weather caused damage to the vessel, rendering it unsalvageable.

Stammers—worked to fulfill. Over the course of the following nine months, all five defendants assisted the CSes' efforts to obtain significant quantities of methamphetamine, resulting in the defendant's agreement to sell, transport, and provide security for 100 kilograms of methamphetamine for $60,000 per kilogram, or $6 million. The defendants participated in several meetings held in Thailand in January, March, May, and August 2013; delivered several samples of methamphetamine to the confidential sources for testing; and conducted a "dry run" shipment of innocuous goods (several thousand kilograms of tea) from the Philippines to Thailand to test their delivery network. The defendants ultimately were charged with conspiring to import methamphetamine to the United States. *See generally United States v. Stammers et al.*, S8 13 Cr. 579 (ALC), Dkt. Entry No. 17 (S.D.N.Y. Nov. 20, 2013) (eighth superseding indictment).[13]

As with the investigation of Hunter, Vamvakias, Gogel, Soborski, and Filter, Leroux provided additional substantial assistance in the investigation of Tan Lim, Kelly, Stammers, Shackels, and Valkovic beyond the introduction of the confidential sources. Leroux maintained regular contact with the defendants by phone and electronic communication (recorded and preserved), under the supervision of the DEA and gave consent for DEA agents to assume his identity in electronic communications, so that agents could communicate posing as Leroux. Leroux also used funds generated by his online pharmacy business to pay expenses for the defendants' efforts on his and the confidential sources' behalf, such as travel.

The five defendants were arrested in Thailand on September 27, 2013, as part of a coordinated takedown along with the arrests of Hunter, Vamvakias, Gogel, Soborski, and Filter.

---

[13] The investigation also targeted other individuals involved in international narcotics trafficking and weapons trafficking, as well as North Korean manufacturers of methamphetamine and military equipment; but with respect to whom the investigation did not result in charges.

The same-day arrests of ten defendants on three continents represented one of the most logistically complex takedowns the DEA has ever conducted, and Leroux's assistance facilitated the successful execution of the arrest plan. Following their extraditions, all five defendants pleaded guilty to the offenses with which they were charged.

C.    **Joseph Hunter, Adam Samia and Carl David Stillwell.**

The charges against Hunter, Vamvakias, Gogel, Soborski, and Filter were based on their participation in s murder-for-hire sting conducted after Leroux's arrest. Leroux's assistance, however, also led to the arrests and prosecution of Hunter, Samia, and Stillwell for their participation in the murder of Catherine Lee in the Philippines in 2012. Leroux provided historical information about the murder and the involvement of the participants, electronic records and communications regarding the murder, and information that led to the discovery of physical evidence in the Philippines, including the location of the van used by the hitmen, Samia and Stillwell, to commit the murder. Information provided by Leroux was also used, along with other evidence, in applications in support of warrants to search email and social media accounts used by Samia and Stillwell and to conduct searches of their residences in Person County, North Carolina, along with electronic devices recovered in those searches. In the course of the 2013 undercover investigation, Hunter also made statements, captured on video recording, about Lee's murder and his involvement.

Samia and Stillwell were charged with conspiring to commit murder and to commit murder-for-hire, conspiring to launder money, and firearms offenses for their participation in Lee's murder in an indictment filed in July 2015. *United States v. Samia and Stillwell*, S8 13 Cr. 521 (RA), Dkt. Entry No. 166 (S.D.N.Y. Jul. 14, 2015) (eighth superseding indictment). Hunter was charged for his participation in the murder in October 2017. *United States v. Hunter et al.*,

S10 13 Cr. 521 (RA), Dkt. Entry No. 446 (S.D.N.Y. Oct. 16, 2017) (tenth superseding indictment).

Hunter, Samia, and Stillwell all proceeded to trial on the charges in the tenth superseding indictment. Trial began on April 2, 2018 and ended with the return of a verdict of guilty on all counts on April 18, 2018. During trial, Leroux testified over the course of three trial days, including approximately a full day on cross-examination by three separate defense attorneys. Leroux testified truthfully.

### D. Lachlan McConnell, Alon Berkman, Moran Oz, Omer Bezalel

In early 2014, Leroux assisted DEA Minneapolis and the Consumer Protection Branch in attempting the lures of his former associates in the Rx Limited business, who were charged in the District of Minnesota, for arrest and extradition or expulsion. Lachlan McConnell, who had served on Leroux's mercenary team in approximately 2008 through 2010, assisted with recruiting pharmacies in the United States to work with Rx Limited, as well as pharmaceuticals shipping operations in the United States, including establishing corporations, bank accounts, credit cards, and shipping accounts. Alon Berkman and Moran Oz were senior managers of Rx Limited in Israel, involved in managing Rx Limited's infrastructure, shipping logistics, physician and pharmacy relations, and merchant processing and banking operations. Omer Bezalel supported Rx Limited's illegal pharmacy business by establishing corporations, bank accounts, credit cards, and shipping accounts for Rx Limited's use.

Under the supervision of the DEA, Leroux engaged in monitored communications with Berkman, Oz, and Bezalel, who resided in Israel, to arrange their travel to Romania. Berkman declined to travel, but Oz and Bezalel agreed to travel to Romania, with the understanding they were going to meet with Leroux. When they got to Romania, they were arrested pursuant to provisional arrest warrants, and subsequently extradited for prosecution in the District of

Minneapolis. Bezalel later fled Minneapolis prior to trial and remains at large. Also supervised by DEA, Leroux attempted to contact McConnell, who resided in the Philippines, and arrange his travel to Haiti, where he would be expelled or extradited to the United States for prosecution. Attempts to contact McConnell were unsuccessful. McConnell later surrendered voluntarily. A fifth defendant, Shai Reuven (also a co-defendant in docket number 12 Cr. 489), was contacted in the course of monitored communications, but did not travel to Haiti as planned.  He remains at large.

Leroux testified at a pretrial suppression hearing on March 2, 2016. Leroux testified truthfully at the hearing. McConnell, Oz, and two co-defendants proceeded to trial, which commenced on February 6, 2017; Leroux did not testify at that trial. McConnell and Oz were acquitted pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

## V.     The Defendant's Post-Plea Conduct

In approximately 2015, Leroux met another inmate, Mir Islam, at the Queens Detention Facility. Islam had pleaded guilty to, and was awaiting sentencing for, various charges of computer crimes and fraud: attempted access device fraud, in violation of 18 U.S.C. § 1029A; conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029B; aggravated identify theft, in violation of 18 U.S.C. § 1028A; and conspiracy to commit computer intrusion, in violation of 18 U.S.C. § 1030B. *See United States v. Mir Islam*, S1 12 Cr. 810 (KMW) (S.D.N.Y.). After his sentencing in March 2016, Islam was transferred to another facility to face charges pending against him in the District of Colombia, *United States v. Mir Islam*, 15 Cr. 67 (RDM) (RMM). During this time period, Leroux discussed with Islam the prospect of opening a call center business together in the Philippines after Islam's release from prison. Leroux claimed that the call center business he and Islam discussed was intended to be for legal e-commerce.

During this time, Leroux violated BOP regulations by providing money to Islam for commissary, phone minutes, and a computer.

Leroux also violated BOP regulations by arranging communications with Islam (after Islam's transfer) using three-way calling on the Queens Detention Facility's attorney phone, which was, unlike the regular inmate phones, unmonitored and unrecorded. Leroux communicated with other individuals who were not part of his defense team in this same manner, until the activity was detected by law enforcement and he was confronted about it. The Government has no information that Leroux and Islam consummated any of the discussed call center business.[14]

While at the Queens Detention Facility, Leroux also violated BOP regulations by giving money to kitchen staff for extra food items.

After being confronted about his use of the prison attorney phone to conduct unmonitored calls, Leroux assisted in an investigation being conducted by the Eastern District of New York and DEA in Long Island of a paralegal used by Leroux's former attorney.

## CONCLUSION

The defendant's criminal conduct, in its range and its seriousness, is significant. The defendant trafficked in illegal pharmaceuticals and narcotics; smuggled gold, chemicals, and

---

[14] According to press reports, after Islam's release from prison he in fact moved to the Philippines, where he has since been arrested for allegedly participating in a murder. *See, e.g.*, Victoria Bekiempis, *Bitcoin Trader Troy Woody and Pal Mir Islam Charged in Philippines Murder*, DAILY BEAST (Dec. 29, 2018), available at https://www.thedailybeast.com/bitcoin-trader-troy-woody-and-pal-mir-islam-charged-in-philippines-murder.

weapons on several continents; ran a weapons R&D program from the Iranian government; funneled large volumes of corrupt payments to multiple government officials for intelligence, protection, and false documents; and operated a mercenary team that committed beatings, shootings, firebombings, and murder.

The defendant's cooperation, however, has also been significant—notably so. Leroux began cooperating immediately after his arrest, giving a post-arrest statement while still in the air on his way from Liberia to the United States, and through his cooperation provided voluminous, detailed information and extensive records and physical evidence. Law enforcement was aware of much of Leroux's criminal conduct prior to his arrest, including his illegal online pharmaceuticals business, involvement in cocaine trafficking and weapons trafficking, and his implication in several murders, but Leroux volunteered significant information about conduct and co-conspirators previously unknown to the Government, including his work for the Iranian government, additional unknown murders, and the involvement of U.S. citizens in an international mercenary network. Leroux participated in an extraordinarily complex and ambitious undercover operation that resulted in the simultaneous arrests of ten defendants involved in violence and significant international drug trafficking and helped to expose North Korean production of producing huge quantities of high-quality methamphetamine distributed by Hong Kong Triad crime groups. The defendant testified truthfully and credibly at a pretrial hearing in Minnesota and at the trial of Samia and Stillwell in this District. His participation in these undercover investigations required hours of meetings with law enforcement and prosecutors on a regular basis for nearly a year. Leroux assisted law enforcement in in shutting down his criminal organization and bringing a dozen of his former associates and mercenaries to justice.

For the reasons stated above, the Government currently intends to request at sentencing that the Court sentence the defendant, Paul Calder Leroux, in light of the factors set forth in Section 5K1.1(a) of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e). We also request that the Court enter an order forfeiting the proceeds of the defendant's criminal offenses and the instrumentalities of the money laundering offenses. The defendant should receive credit against his forfeiture obligation for proceeds that have been confiscated by foreign governments or which the defendant expended in furtherance of law enforcement operations.

Dated: New York, New York
      May 28, 2020

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney

            By:       /s/
                Emil J. Bove / Rebekah Donaleski /
                Michael D. Lockard /
                Assistant United States Attorneys
                (212) 637-2444/-2423/-2193

cc:    James Branden, Esq. (by email)
       Jemmard Thomas, US Probation Officer (by email)